EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| In re:<br><br>Hon. Roberto L. García Vega<br>Juez Superior<br>Tribunal de Primera Instancia<br>Sala de Utuado | 2013 TSPR 128<br><br>189 DPR ____ |
| --- | --- |

Número del Caso: AD-2011-3

Fecha: 1 de noviembre de 2013

Oficina de Administración de los Tribunales
Oficina de Asuntos Legales:

      Lcda. Cristina Guerra Cáceres
      Lcdo. Félix Fumero Pugliessi

Abogado de la Parte Querellada:

      Lcdo. Efraín Guzmán Mollet

Materia: Conducta Profesional – La suspensión será efectiva el 6 de noviembre de 2013, fecha en que se le notificó al abogado de su suspensión inmediata.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Hon. Roberto L. García Vega
Juez Superior
Tribunal de Primera Instancia                AD-2011-3
Sala de Utuado

*PER CURIAM*

En San Juan, Puerto Rico, a 1 de noviembre de 2013.

Nos corresponde evaluar el comportamiento del exjuez Roberto García Vega, a quien se le imputaron infracciones a los Cánones de Ética Judicial. Esas imputaciones tienen su génesis en el procedimiento disciplinario AD-2011-3. En específico, al entonces juez se le atribuyeron transgresiones a los Cánones 1, 3, 23 y 30 de Ética Judicial. 4 L.P.R.A. Ap. IV-b.

Durante el trámite del proceso disciplinario, el licenciado García Vega renunció a su cargo de Juez Superior. Así pues, el asunto que tenemos ante nuestra consideración es analizar si las

actuaciones del licenciado García Vega en el desempeño de su cargo como juez, generaron violaciones a los Cánones de Ética Profesional.

**I**

El Lcdo. Roberto L. García Vega juramentó el 18 de noviembre de 2009 al cargo de Juez Superior. Comenzó a realizar sus funciones en el Tribunal de Primera Instancia, Sala de Utuado.

El viernes, 28 de enero de 2011, en horas de la noche, el licenciado García Vega conducía su auto marca *Toyota Yaris* color blanco de 2010. Lo acompañaba la Lcda. Lizette Meléndez a quien buscó esa noche en un condominio en Hato Rey. Mientras el licenciado García Vega transitaba en dirección de Hato Rey a Santurce, dobló a la izquierda en la avenida Roberto H. Todd. Cuando llegó a un semáforo que tenía la luz roja detuvo el vehículo. En ese momento, alrededor de las 11:15 P.M., transitaba por el carril derecho de la avenida Roberto H. Todd en dirección a la avenida Kennedy, pues iba a llevar a la licenciada Meléndez a recoger su vehículo que estaba estacionado en el Tribunal de Primera Instancia, sala de Bayamón. Detrás del auto del licenciado García Vega había un auto compacto y luego una guagua alta donde estaban las Sras. Zamarys Rodríguez Suárez y Shala Andújar Santos. Antes de que el semáforo con luz roja cambiara a luz verde, el licenciado García Vega emprendió la marcha.

Esa misma noche, la enfermera Luciana Genao salió de trabajar a las 11:00 P.M. de su trabajo en el edificio *Caribbean Tower* en Miramar. Salió del edificio, abordó su vehículo *Mitsubishi Montero Sport* de 1999, e inició la marcha hacia su residencia, ubicada en la urbanización Villas de Caney, en Trujillo Alto. La señora Genao transitaba por el carril derecho de la avenida Fernández Juncos y se detuvo ante el semáforo que interseca con la avenida Roberto H. Todd pues la luz estaba roja. Al cambiar la luz a verde, la señora Genao prosiguió la marcha. En tanto, el licenciado García Vega inició la marcha con la luz roja e impactó la guagua de la señora Genao por el lado del conductor.

Al recibir el impacto, la señora Genao pensó que "iba a morir". El guía de su guagua se rompió, el vehículo perdió control, comenzó a moverse de forma zigzagueante, dio varias vueltas, se trepó en la acera y pasó entre un árbol y un poste de luz. Finalmente, el vehículo de la señora Genao impactó un poste de señal de tránsito que estaba en el carril exclusivo de la Autoridad Metropolitana de Autobuses y se estrelló en la vitrina del local Makro hasta terminar en su interior. La señora Genao perdió el conocimiento.

En el momento en que ocurrió el incidente, el agente Ángel Vélez Rosado se encontraba junto con el agente Rodríguez Ñeco frente a la Pizzería la Putanesca, en la Parada Núm. 18 en Santurce. En particular, orientaban a un ciudadano sobre qué hacer respecto a un acto de vandalismo

que ocurrió en el lugar. Mientras dialogaban con el ciudadano, se escuchó un frenazo. El agente Vélez Rosado se viró, vio el impacto y observó que el carro que conducía el licenciado García Vega se detuvo y dio la impresión de que iba a estacionarse en la Farmacia Walgreens, que estaba cerca. No obstante, el auto no se detuvo y prosiguió la marcha. En ese momento el agente Vélez Rosado comenzó a perseguir el auto del licenciado García Vega. Por su parte, la señora Rodríguez Suárez también observó que el vehículo no se detuvo y decidió seguirlo para anotar el número de la tablilla.

El agente Vélez Rosado le indicó con gestos al licenciado García Vega que se parara, ya que su motora no tenía sirena, aunque sí estaba identificada como un vehículo oficial de la Policía. El entonces juez García Vega siguió la marcha y atravesó dos semáforos con luz roja. Segundos después el agente Vélez Rosado alcanzó el vehículo, se paró a su lado izquierdo y ordenó al licenciado García Vega que se detuviera. Este último se estacionó en la estación de gasolina Shell de la calle Labra, intersección con la calle Nueva Palma, seis cuadras después del lugar de la colisión. De esa forma, el licenciado García Vega rebasó las calles Torre de la Vega, Corchado, Las Palmas, Progreso, Valencia y Nueva Palma antes de detenerse. La señora Rodríguez Suárez también detuvo su guagua en el garaje Shell, a veinte pies del vehículo del licenciado García Vega.

El agente Vélez Rosado le preguntó al licenciado García Vega "si él se había percatado de que había ocasionado un accidente". Este contestó en la afirmativa. El agente le dijo que no se estacionó en el lugar del accidente. El licenciado García Vega le contestó que se iba a estacionar. De modo irónico, el agente Vélez Rosado le cuestionó "si se iba a estacionar en la casa ya que desde el lugar del accidente a donde yo pude intervenir en ese lapso de distancia había mucho espacio para estacionarse". Durante su testimonio el agente indicó que el licenciado García Vega podía estacionarse al lado de la Farmacia Walgreens, o en el puesto de gasolina Texaco que se encuentra frente a la farmacia. La señora Rodríguez Suárez también se bajó indignada de su vehículo y le cuestionó "es increíble, usted no se iba a parar, o sea, acaba de ocasionar un accidente". El licenciado García Vega respondió "mala mía".

El agente Vélez Rosado testificó que al detener el vehículo observó que en el lado izquierdo del guía había unas latas de cervezas. También le preguntó al licenciado García Vega si había ingerido bebidas alcohólicas, a lo que contestó que sí. Sin embargo, el agente no pudo especificar si las latas de cervezas estaban frías o calientes. El agente Vélez Rosado desconocía que el licenciado García Vega era juez y que su acompañante era abogada. Se enteró más de un año después.

Mientras tanto, la señora Genao recobró el conocimiento al sentir que se asfixiaba, ya que entraba humo en la

guagua. De lejos escuchaba voces que le preguntaban: "¿Estás sola, puedes salir?" Trató de abrir la puerta del auto pero no pudo porque estaban cayendo muchos cristales de la vitrina del local de Makro y de su guagua, así que se quedó pillada. Al llegar los paramédicos le ayudaron a salir, mientras ella temblaba y sentía mucho miedo. El agente Edwin Medina Rosado auxiliaba al personal de emergencias médicas para sacar a la señora Genao del vehículo cuando recibió un mensaje por radio del sargento Ortíz indicándole que pasara más adelante, como a siete calles, porque tenían a "la otra parte del accidente".

A las 11:30 P.M. el agente Medina Rosado llegó a la estación de gasolina Shell donde se encontraban el licenciado García Vega, el agente Vélez Rosado y el sargento Ortiz. El último le dio instrucciones al agente Medina Rosado para que investigara el accidente. El agente Vélez Rosado se retiró del lugar y las señoras Rodríguez Suárez y Andújar Santos permanecieron observando.

El agente Medina Rosado le solicitó al licenciado García Vega que saliera del vehículo para entrevistarlo y le solicitó su documentación. Testificó que en ese momento percibió en el vehículo unas latas de cerveza Medalla en el portavasos. Cuando el agente Medina Rosado entrevistó al licenciado García Vega, percibió un fuerte olor a alcohol por lo que le dijo que tenía motivos fundados para someterlo a una prueba de alcohol. Luego de leerle las advertencias de rigor, lo arrestó. El agente Medina Rosado no entrevistó a

la licenciada Meléndez porque ella no "era parte de la investigación". Aun así, ella se acercó al agente Medina Rosado y adujo que las latas de cervezas eran suyas y no del licenciado García Vega.

Acto seguido, montó al licenciado García Vega en la patrulla para transportarlo a la División de Tránsito, Sección de Patrullas y Carreteras, donde se realizaría la prueba de alcohol. En el garaje Shell permanecieron el sargento Ortiz junto a otros policías, las señoras Rodríguez Suárez, Andújar Santos y la licenciada Meléndez, a quien el licenciado García Vega le entregó las llaves de su vehículo.

El agente Medina Rosado llevó al licenciado García Vega a la División de Tránsito ubicada detrás del Cuartel de la Policía de la Calle Eleanor Roosevelt. Durante el trayecto el licenciado García Vega expresó que deseaba someterse a la prueba de sangre. Una vez llegaron a la División de Tránsito le informaron que no había envases para realizar esa prueba. El agente Medina Rosado decidió hacer la prueba de aliento, pero el licenciado García Vega se negó y no se sentó en el área para hacer la prueba ni sopló en la máquina *Intoxilyzer*. Sobre esa situación, el agente Medina Rosado testificó que desconocía que podía llevar al licenciado García Vega a un hospital para hacerle la prueba o ante un magistrado para que se ordenara la prueba de aliento. Admitió que nunca había trabajado con pruebas de sangre.

Sin duda la investigación realizada por la Policía fue deficiente. No se sacaron fotos del vehículo ni se confiscó.

No se emitió una multa al licenciado García Vega por pasar la luz roja del semáforo. Tampoco se expidieron boletos por tener envases abiertos de bebidas alcohólicas en el vehículo (Art. 7.01 de la Ley Núm. 22-2000, conocida como la Ley de Vehículos y Tránsito de Puerto Rico, 9 L.P.R.A. sec. 5201) ni se confiscaron las latas de cerveza.

Mientras estaban en la División de Tránsito, el licenciado García Vega le mencionó al agente Medina Rosado que era juez. El agente Medina Rosado testificó:

> Me enteré en la entrevista que le hice al caballero. Parte ... cuando él me menciona su empleo pues me pide, pues este cierta consideración. Yo le dije pues mi trato va a ser independientemente el mismo tal y cual trato a todo el mundo. De hecho nosotros no teníamos ningún problema. Incluso cuando se solicitó la cita nosotros ... nos sentamos y de acuerdo al "Schedule" de él fue que se le dio una fecha. Informe de la Comisión, pág. 7.

Añadió el agente que para citarlo inicialmente le dio una fecha, pero el entonces juez García Vega la rechazó porque en ese día tenía que atender su sala en el tribunal. Finalmente se dejó ir al licenciado, quien fue recogido por la licenciada Meléndez en el vehículo Toyota Yaris chocado.

En la madrugada del sábado, 29 de enero de 2011, el licenciado García Vega y la licenciada Meléndez acudieron al Centro de Diagnóstico y Tratamiento (CDT) de la calle Hoare, donde convalecía la señora Genao. Allí preguntaron por la condición de esta última y hablaron con el médico que la atendía. También se comunicaron directamente con la señora Genao, quien estaba acostada en una cama y sufría mucho

dolor. El licenciado García Vega se identificó como la persona involucrada en el accidente con ella. La señora Genao le dio tres números telefónicos de contacto y su dirección residencial. También le comentó que su hijo la buscaría al CDT.

El agente Medina Rosado también acudió al CDT a entrevistar a la señora Genao. Allí habló con el médico y tomó los datos que entendió necesarios para preparar su informe. Luego lo completó y dejó en blanco el encasillado que proveía para especificar la ocupación del licenciado García Vega. Al momento de rendir el informe no había entrevistado a las señoras Rodríguez Suárez y Andújar Santos.

Entre las 9:00 A.M. y 10:00 A.M. del día despúes del accidente la señora Genao fue dada de alta médica y su hijo menor fue a recogerla. En el CDT le hicieron varios exámenes, le inyectaron medicamentos y le dieron un referido médico. Como consecuencia del accidente tuvo golpes, abrasiones, así como laceraciones en la espalda, la cara, el tobillo y otras partes del cuerpo. No tuvo fracturas.

Entre las 2:00 P.M. y 2:30 P.M. de ese mismo día el licenciado García Vega y la licenciada Meléndez fueron a la residencia de la señora Genao. Allí vieron los daños del vehículo y el licenciado García Vega ofreció llevarlo a un hojalatero para que lo arreglara.

Al día siguiente el licenciado García Vega y la licenciada Meléndez volvieron a la residencia de la señora

Genao en compañía de un hojalatero. Se inspeccionó el auto. El hojalatero concluyó que era pérdida total. Entonces, el licenciado García Vega le indicó a la señora Genao que podían acudir al Seguro Compulsorio para tratar de solucionar la situación.

Uno o dos meses después del accidente, pero antes de ir al Seguro Compulsorio, la señora Genao se enteró de que el licenciado García Vega era juez porque su esposo se lo dijo a ella luego de recibir una llamada telefónica citándola para que un fiscal la entrevistara. La persona que llamó a la casa de la señora Genao informó que el licenciado García Vega era un "funcionario del gobierno".

Posteriormente la señora Genao y el licenciado García Vega acudieron al Seguro Compulsorio. Esa oficina, mediante una fórmula, le otorgó a la señora Genao la cantidad de $3,500, suma menor al valor del auto. Ante esa situación, la señora Genao le reclamó al licenciado García Vega que el vehículo costaba más de la cantidad que le había dado el Seguro Compulsorio. El licenciado García Vega se ofreció a pagarle la diferencia para completar el valor del auto, unos $5,000. La señora Genao se quedó con el auto que, según el licenciado García Vega, conservaba piezas en buen estado.

Varios meses después del accidente el licenciado García Vega y la licenciada Meléndez acudieron por tercera vez a la residencia de la señora Genao. En esa ocasión la licenciada Meléndez le expresó a la señora Genao que "yo soy abogada y él es juez". Luego el licenciado García Vega le entregó la

cantidad de $1,800 en efectivo, la diferencia entre el valor del vehículo y el pago del Seguro Compulsorio. Esa cantidad superaba la suma total del vehículo así como los gastos de grúa y otros relacionados. Además, se llevó un recibo para la firma de la señora Genao. La licenciada Meléndez entregó el recibo a la señora Genao para que lo firmara y le preguntó si ella o su esposo lo querían leer. Su esposo dijo que no y la señora Genao tampoco lo leyó, según ella porque su esposo tiene 81 años y ella no estaba en condiciones de leer. También estaba su hijo, quien tampoco leyó el documento. Entonces, la licenciada Meléndez leyó en voz alta el recibo que especificaba que la señora Genao renunciaba a reclamaciones civiles y criminales por causa del accidente. La señora Genao firmó el recibo y lo fotocopió en una máquina que tenía en su casa.

La señora Genao recibió tratamiento médico y psiquiátrico a través de la ACAA. Testificó que ya no puede desempeñarse como enfermera práctica por los dolores y espasmos que sufre.

En el caso penal contra el licenciado García Vega se determinó causa probable para arresto por violación a los Arts. 4.02, 5.07, 7.01 y 7.05 de la Ley Núm. 22-2000, supra, 9 L.P.R.A. secs. 5102, 5128, 5202, 5205. A raíz de esa determinación se emitió una orden administrativa en la que se suspendió al licenciado García Vega de sus funciones judiciales. También se autorizó el inicio de una

investigación administrativa sobre posible conducta antiética.

El 23 de septiembre de 2011, luego de recopilar la prueba y con el beneficio de la comparecencia del licenciado García Vega, la Oficina de Administración de los Tribunales (OAT) presentó un Informe de Investigación. El 11 de octubre de 2011 la Comisionada Asociada Delia Lugo Bougal, determinó la existencia de causa probable para autorizar la continuación de los procedimientos.

La OAT presentó una querella contra el licenciado García Vega imputándole violaciones a los Cánones 1, 3, 23 y 30 de Ética Judicial. 4 L.P.R.A. Ap. IV-b. En específico, en el primer cargo se le atribuyó al licenciado García Vega incurrir en conducta impropia al provocar un accidente automovilístico en el que resultó herida una persona y hubo daños a la propiedad ajena, y luego abandonar apresuradamente el lugar en vez de detenerse. Asimismo, se le imputó en el segundo cargo incurrir en conducta indebida al manejar su vehículo de motor bajo los efectos de bebidas embriagantes, provocando el accidente en cuestión. Por último, en el tercer cargo se le atribuyó al licenciado García Vega utilizar la autoridad y prestigio de su cargo como juez para influir indebidamente al solicitar un trato favorable por parte de la Policía de Puerto Rico y hacer que la señora Genao firmara un relevo de responsabilidad tanto en el ámbito penal como en el civil.

El 12 de diciembre de 2011 el licenciado García Vega solicitó la paralización del procedimiento disciplinario hasta que culminara el procedimiento penal que corría de forma paralela. La OAT se opuso a esa solicitud. La Comisión de Disciplina Judicial denegó la paralización. El 3 de enero de 2012 el licenciado García Vega contestó la querella y negó todas las alegaciones como mecanismo para "preservar los derechos fundamentales del juez querellado mientras estén vigentes las denuncias criminales". La Comisión de Disciplina Judicial señaló la fecha para una vista evidenciaria y obligó a las partes a que se reunieran. El 7 de febrero de 2012 el licenciado García Vega volvió a solicitar la paralización del proceso disciplinario. La OAT se volvió a oponer al pedido y la Comisión de Disciplina Judicial denegó nuevamente la paralización.

El 14 de marzo de 2013 se suspendió el proceso por motivos de salud de la representación legal del licenciado García Vega. La Comisión concedió más tiempo para la presentación del informe de conferencia entre abogados y pautó la vista para el 30 de mayo de 2012.

El 23 de abril de 2012 se presentó una tercera moción para paralizar el procedimiento, que se declaró no ha lugar. El 9 de mayo de 2012 se presentó el informe de conferencia con antelación a la vista.

Inconforme con la denegación de la paralización del proceso, el licenciado García Vega acudió ante este Tribunal mediante una moción en auxilio de jurisdicción y solicitud

de orden provisional en la que pidió la interrupción del procedimiento. El 18 de mayo de 2012 declaramos esa moción no ha lugar.

Luego de varios incidentes, el licenciado García Vega presentó una cuarta solicitud de paralización del procedimiento disciplinario, a la luz de lo resuelto por este Foro en Pueblo v. García Vega, 186 D.P.R. 592 (2012). En ese caso resolvimos que un referido a la División de Integridad Pública del Departamento de Justicia para que ausculte si procede la designación de un Fiscal Especial Independiente, constituye justa causa para prorrogar los términos de juicio rápido, por lo que no procedía la desestimación de los cargos penales contra el licenciado García Vega. La Comisión de Disciplina Judicial no autorizó la paralización.

Luego de que la Comisión celebrara las vistas evidenciarias correspondientes, las partes presentaron sendos memorandos de derecho con sus planteamientos finales. En esencia, la OAT sostiene que el licenciado García Vega abandonó el lugar luego de ocasionar el accidente, bajo los efectos de bebidas alcohólicas y que utilizó su posición como juez para influir al agente Vélez Rosado y la señora Genao. Por su parte, el licenciado García Vega sostuvo que no se probaron los cargos con el *quantum* de prueba requerido. Negó que se haya ido a la fuga y sostuvo que no se detuvo en el momento porque quería encontrar un lugar seguro para estacionarse. Además, indicó que no acostumbraba

ingerir bebidas alcohólicas. También impugnó la intervención policiaca y cuestionó la existencia de las latas de cerveza. En cuanto al tercer cargo expresó que nunca intentó influenciar de forma indebida a la señora Genao ni al agente Vélez Rosado. Asimismo, sostiene que con su conducta no violentó su deber de conducirse de forma ética y respetuosa con todas las personas con que tuvo que comunicarse durante el proceso.

Así, el caso quedó sometido en los méritos para que la Comisión de Disciplina Judicial emitiera su recomendación. Esa Comisión formuló su informe el 19 de abril de 2013. Se concluyó por unanimidad de los comisionados que el licenciado García Vega incurrió en la conducta imputada en el primer cargo, violando los Cánones I, III y XXIII de Ética Judicial, supra, al provocar un accidente automovilístico, causar daños e irse a la fuga. Hubo discrepancia en cuanto a los cargos segundo y tercero en los cuales se le imputó al licenciado García Vega manejar su vehículo bajo los efectos de bebidas embriagantes y utilizar la autoridad y prestigio de su cargo como juez para solicitar un trato favorable por parte de la policía e influir en la víctima del accidente para que firmara un relevo de responsabilidad. Los comisionados Aida Molinary de la Cruz, Juan Salgado Morales y Carmen Sierra Corredor sostienen que esos dos cargos quedaron probados. Por su parte, los comisionados Evelyn Benvenutti Toro, José Miranda

de Hostos y Lourdes Velázquez Cajigas concluyeron que la OAT no probó esos cargos.

También hubo discrepancia en cuanto a la sanción a imponerse. Los comisionados Molinary de la Cruz, Salgado Morales, Sierra Corredor y Benvenutti Toro recomendaron como sanción la destitución del licenciado García Vega de su cargo de juez superior. Por otro lado, los comisionados Miranda de Hostos y Velázquez Cajigas recomendaron como sanción una suspensión de empleo y sueldo por el término de seis meses.

Mientras este Foro deliberaba sobre el asunto, el licenciado García Vega renunció a su cargo de Juez Superior y el Gobernador de Puerto Rico, Hon. Alejandro García Padilla, le aceptó la renuncia. A la luz de ello, emitimos una Resolución en la que ordenamos al licenciado García Vega que mostrara causa por la cual su conducta no debía ser sancionada al amparo del Código de Ética Profesional, 4 L.P.R.A. Ap. IX. Nuestra orden se cumplió.

Luego de evaluar el expediente, estamos en posición de resolver.

## II

En In re Ríos Ríos, 175 D.P.R. 57, 74 (2008), sostuvimos que los abogados tienen un interés propietario en el ejercicio de la profesión legal. En su consecuencia, los abogados son acreedores de las garantías que ofrece el debido proceso de ley en su vertiente procesal en aquellos

procedimientos disciplinarios en que esté en juego su título. In re Ruffalo, 390 U.S. 544, 550 (1968).

No obstante, es necesario tener presente cuál es el proceso debido. En específico, mencionamos en Rivera Rodríguez & Co. v. Stowell Taylor, 133 D.P.R. 881, 887-888 (1993) que: "el debido proceso de ley procesal le impone al Estado la obligación de garantizar que la interferencia con los intereses de libertad y propiedad del individuo se haga a través de un procedimiento que sea justo y equitativo". Es decir, el debido proceso de ley es pragmático y "debe ser fundamentalmente justo al individuo en la resolución de los hechos y derechos que sirven de base para aquellas acciones gubernamentales que le privan de su vida, libertad o propiedad". Rivera Santiago v. Secretario de Hacienda, 119 D.P.R. 265, 274 (1987).

Por otro lado, resolvimos en In re Pérez Riveiro, 180 D.P.R. 193, 200 (2010), que el debido proceso de ley que hay que conferirle a los abogados en el proceso disciplinario "se satisface siempre que se le provea al abogado querellado la oportunidad de responder y defenderse de los cargos imputados y notificados, así como de las teorías en las que se basen". Específicamente, en In re Martínez Almodóvar, 180 D.P.R. 805, 825-826 (2011), mencionamos que

> a modo de excepción, en las instancias en donde el expediente ante la consideración del Tribunal refleje que en cuanto a la conducta impropia adicional al querellado se le han salvaguardado todas las garantías que emanan del debido proceso de ley, el Tribunal podrá -si lo estima apropiado- evaluar y atender dicha conducta adicional dentro del mismo procedimiento disciplinario, sin

necesidad de referirla al Procurador General. Sólo así protegeremos efectivamente las garantías constitucionales del abogado-querellado y no se menoscabará su oportunidad de preparar adecuadamente su defensa ni se le impedirá velar por su sustento.

Recientemente, en In re Rodríguez Plaza, 182 D.P.R. 328 (2011), atendimos una situación procesal casi idéntica a la que nos ocupa. Allí la querellada Rodríguez Plaza también renunció a su cargo de juez luego de que la Comisión de Disciplina Judicial emitiera su informe con relación a unas querellas que la Oficina de Administración de los Tribunales le había presentado. En ese caso disciplinamos a la licenciada Rodríguez Plaza por quebrantar el Canon 38 de Ética Profesional, 4 L.P.R.A. Ap. IX, aunque la querella imputó violación de los Cánones 4, 8, 9, 13, 14 y 33 de los de Ética Judicial. 4 L.P.R.A. Ap. IV-b.

En el caso ante nuestra consideración, al igual que en In re Rodríguez Plaza, supra, no se enmienda la querella para añadir hechos nuevos. Sencillamente, debemos disciplinar al licenciado García Vega bajo el palio del Código de Ética Profesional y no al amparo del Código de Ética Judicial porque renunció a su cargo como juez. Además, el querellado tuvo amplia oportunidad de presentar prueba y refutar la que presentó la Administración de Tribunales. En palabras del Tribunal Supremo federal, nuestra actuación de disciplinar al licenciado García Vega al amparo del Código de Ética Profesional no constituye una "trampa" para enmendar la querella sin previo aviso al abogado. Zauderer v. Office of Disciplinary Counsel of Supreme Court, 471 U.S.

626, 655, n.18 (1985), citando a <u>In re Ruffalo</u>, <u>supra</u>, pág. 551, n. 4.

De igual forma, la Regla 33 de las de Disciplina Judicial establece que "[l]a renuncia o la expiración del término del nombramiento de la jueza o del juez querellado no impedirá que continúe el procedimiento disciplinario en su contra al amparo de este reglamento. La Comisión determinará si la conducta amerita la recomendación de imponerle a la jueza o al juez querellado medidas disciplinarias por violación al Código de Ética Profesional." 4 L.P.R.A. Ap. XV-B. Así pues, reiteramos que la renuncia de un miembro de la Judicatura o el vencimiento de su término no impide la continuación de un procedimiento disciplinario en su contra, siempre que la alegada conducta impropia pueda dar lugar a una sanción disciplinaria. <u>In re Santiago Rodríguez</u>, 160 D.P.R. 245, 253 (2003).

**IV**

El Canon 38 de Ética Profesional, 4 L.P.R.A. Ap. IX, dispone en lo concerniente:

> El abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia. En su conducta como funcionario del tribunal, deberá interesarse en hacer su propia y cabal aportación hacia la consecución de una mejor administración de la justicia. […]

> Por razón de la confianza en él depositada como miembro de la ilustre profesión legal, todo abogado, tanto en su vida privada como en el desempeño de su profesión, debe conducirse en forma digna y honorable.

En su consecuencia, un abogado que no se conduce digna y honorablemente viola el Canon 38 de Ética Profesional. *In re Hernández Vázquez*, 180 D.P.R. 527, 541 (2010); *In re Roldán Figueroa*, 106 D.P.R. 4, 12 (1977). Recordemos que los abogados están obligados a evitar la conducta impropia en su vida profesional y personal, tanto en la realidad como en la apariencia. *In re Cotto Luna*, Op. de 20 de diciembre de 2012, 2013 T.S.P.R. 8, 2013 J.T.S. 11, 187 D.P.R. __ (2013); *In re Peña, Santiago*, 185 D.P.R. 764, 781 (2012). De lo contrario, podrían enfrentar la suspensión o desaforo del ejercicio de la profesión. *In re Campoamor Redín*, 150 D.P.R. 138, 153 (2000).

En ese sentido, hemos reiterado que los abogados son el espejo donde se refleja la imagen de la profesión. *In re Fontánez Fontánez*, 181 D.P.R. 407, 417 (2011). Por esa razón, "deben actuar con el más escrupuloso sentido de responsabilidad que impone la función social que ejercen". *In re Nieves Nieves*, 181 D.P.R. 25, 45 (2011). Véase, además, *In re Cuyar Fernández*, 163 D.P.R. 113, 117 (2004).

En nuestra jurisprudencia existen varios precedentes en los que hemos disciplinado a abogados por su conducta como jueces. Por ejemplo, en *In re Liceaga*, 82 D.P.R. 252 (1961), desaforamos permanentemente a un abogado porque en su desempeño como juez sentenció e impuso multas y costas a varias personas en vistas para determinación de causa probable sin que se hubiese presentado una denuncia. Concluimos que el juez se apropió ilegalmente de la cantidad

de $577.25. Al actuar de esa forma, expresamos que la conducta del entonces juez José Antonio Liceaga "tiende a desacreditar el concepto del público de la justicia y a menospreciar las condiciones morales que debe reunir todo abogado". Íd., pág. 259. Ese estándar que usamos para medir la actuación del entonces juez Liceaga es muy similar a la apariencia de conducta impropia que contiene el Canon 38 del Código de Ética Profesional, supra.

Por su parte, en In re Santiago Rodríguez, supra, disciplinamos a la Lcda. Elba Santiago Rodríguez porque como juez discriminó por razón de género contra las mujeres víctimas de violencia doméstica que acudían a su sala a buscar órdenes de protección. En particular, utilizamos el Canon 38 del Código de Ética Profesional, supra, y no los Cánones de Ética Judicial debido a que la licenciada Santiago Rodríguez había renunciado a su cargo como juez. Determinamos entonces que "las expresiones discriminatorias de la licenciada Santiago Rodríguez hacia las mujeres víctimas de violencia doméstica se apartaron de la conducta digna y honorable que exige el Canon 38, supra".

Por otro lado, en In re Suárez Marchán, 159 D.P.R. 724 (2003), censuramos enérgicamente a un abogado que en su desempeño como juez participó y decidió varios asuntos procesales de un caso de alimentos en el que las partes eran amigas suyas. Además, durante el trámite del caso, le recomendó a una de las partes que contratara a cierto abogado. Por último, el juez mantuvo comunicación privada

con una de las partes. Todo eso fue una clara violación de los Cánones de Ética Judicial. Sin embargo, como el licenciado Suárez Marchán ya no era juez, lo disciplinamos bajo el palio de los Cánones de Ética Profesional. En específico, mencionamos que

> [l]a conducta del licenciado Suárez Marchán dista mucho de una que propenda a la exaltación del honor de la profesión legal. Por el contrario, sus actuaciones en todo tiempo aparentaron estar encaminadas a beneficiar, desde su posición como Juez Superior, a la señora Cruz Negrón y de utilizar su cargo para alterar el adecuado funcionamiento del sistema judicial. Íd., pág. 745.

Por último, en In re Rodríguez Plaza, supra, pág. 346, resolvimos que la licenciada Rodríguez Plaza infringió el Canon 38 de Ética Profesional, supra, al exhibir una conducta indigna ya que utilizó el poder de su cargo judicial para vejar a compañeros abogados y al público en general. En vista de que la licenciada Rodríguez Plaza tenía un historial profesional inmaculado, limitamos nuestra sanción a una censura enérgica.

En el caso que nos ocupa quedó establecido que el entonces juez García Vega provocó el accidente de tránsito en cuestión. Eso de por sí no constituye una falta ética. Sin embargo, también se probó que luego de ocurrir el incidente, el licenciado García Vega se dio a la fuga. Tres testigos oculares (agente Vélez Rosado y las señoras Rodríguez Suárez y Andújar Santos) presenciaron la huida del entonces juez y lo persiguieron hasta lograr que se detuviera seis calles adelante. Con esa actuación, el

licenciado García Vega quebrantó el Canon 38 de Ética Profesional, supra. Tomamos conocimiento judicial de que el licenciado García Vega resultó culpable de quebrantar los Arts. 4.02 (no detener un vehículo involucrado en un accidente de tránsito) y 5.07 (conducir un vehículo de forma imprudente o negligentemente temeraria) de la Ley Núm. 22, supra.

Por su parte, concluimos que la conducta del licenciado García Vega de usar la autoridad y prestigio de su cargo judicial para solicitar un trato favorable por parte de la Policía e influir en la víctima del accidente para que ella firmara un relevo de responsabilidad, excedió los contornos éticos que regulan la profesión legal. Canon 38 de Ética Profesional, supra. El agente Medina Rosado testificó con claridad que el entonces juez García Vega le pidió consideración por razón de su empleo. Informe de la Comisión, pág. 7. También surge del expediente que la tercera vez que el licenciado García Vega acudió a la casa de la señora Genao le hizo firmar un relevo de responsabilidad en un ambiente totalmente inadecuado. Nótese que no se le dio oportunidad a la señora Genao para que consultara con un abogado sobre la conveniencia de firmar el relevo.[1] No es antiético realizar ofertas de transacción de posibles reclamaciones civiles. Sin embargo, esa gestión no se puede llevar a cabo en un ambiente cargado en el cual,

---

[1] No entraremos a dilucidar la validez del relevo de responsabilidad que firmó la señora Genao porque esa controversia no está ante nuestra consideración.

antes de hacerse la oferta, se le recuerda a la perjudicada, quien no está representada por un abogado, que el responsable de los daños "es juez" y la persona que lo acompaña es "abogada".

Por último, al aplicar el criterio de prueba que el debido proceso de ley exige en estos casos disciplinarios, concluimos que no existe prueba clara, robusta y convincente en el expediente que nos permita concluir que el querellado manejó su auto bajo los efectos de bebidas embriagantes. In re Soto Charraire, 186 D.P.R. 1019 (2012); In re Martínez Almodóvar, 180 D.P.R. 805 (2011); In re Irizarry Vega, 176 D.P.R. 241 (2009). De la prueba presentada por la OAT surge que los policías que investigaron el accidente no ocuparon las latas de cerveza que observaron en el auto, ni se expidieron multas administrativas. Tampoco se le hizo una prueba de alcohol al licenciado García Vega. En fin, la investigación realizada fue deficiente y no nos produce "una convicción duradera de que las contenciones fácticas son altamente probables". In re Rodríguez Mercado, 165 D.P.R. 630, 641 (2005). Tomamos conocimiento judicial de que el licenciado García Vega **no** resultó culpable de quebrantar los Arts. 7.01 (conducir vehículo bajo los efectos de bebidas embriagantes y poseer envase abierto con bebidas embriagantes) y 7.05 (causar daño corporal a una persona con un vehículo bajo los efectos de bebidas embriagantes) de la Ley Núm. 22, supra.

Debemos considerar también el historial del querellado. Este es el primer incidente disciplinario en el que se ve involucrado, como abogado o como juez.

**V**

Considerado todo lo anterior, ordenamos la suspensión inmediata del Lcdo. Roberto García Vega de la práctica de la profesión por el término de **dos años**. El querellado tiene el deber de notificar a todos sus clientes su inhabilidad para continuar con su representación y deberá devolver a éstos los expedientes de los casos pendientes así como los honorarios recibidos por trabajos no rendidos. Además, tiene el deber de informar oportunamente de su suspensión a los foros judiciales y administrativos. Estas gestiones deberán ser certificadas a este Tribunal dentro del término de treinta días a partir de la notificación de esta Opinión.

La OAT nos informa que presentó ante la Comisión de Disciplina Judicial un Informe de Investigación que se realizó en torno a una supuesta conducta del licenciado García Vega por nuevos hechos íntimamente relacionados con el procedimiento disciplinario de epígrafe. Con ese informe se acompañan unas declaraciones juradas que pueden suponer el comienzo de otro procedimiento disciplinario contra el licenciado García Vega. En particular, se le imputa al licenciado García Vega tratar de influenciar a un miembro de la Comisión de Ética Judicial para que reconsiderara su voto en este procedimiento disciplinario.

Se remite a la atención de la Procuradora General el Informe de Investigación que preparó la OAT por los hechos posteriores que están íntimamente relacionados con el procedimiento disciplinario de epígrafe para que ausculte si procede presentar una querella ética. Esta encomienda deberá realizarse con prontitud y mientras el licenciado García Vega cumple los dos años de suspensión.

Se dictará Sentencia de conformidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:


Hon. Roberto L. García Vega
Juez Superior
Tribunal de Primera Instancia                 AD-2011-3
Sala de Utuado


*SENTENCIA*

En San Juan, Puerto Rico, a 1 de noviembre de 2013.

Por los fundamentos expuestos, en la Opinión Per Curiam que antecede, la cual se hace formar parte integrante de la presente Sentencia, se ordena la suspensión inmediata del Lcdo. Roberto García Vega de la práctica de la profesión por el término de **dos años**. El querellado tiene el deber de notificar a todos sus clientes su inhabilidad para continuar con su representación y deberá devolver a éstos los expedientes de los casos pendientes así como los honorarios recibidos por trabajos no rendidos. Además, tiene el deber de informar oportunamente de su suspensión a los foros judiciales y administrativos. Estas gestiones deberán ser certificadas a este Tribunal dentro del término de treinta días a partir de la notificación de esta Opinión.

Se remite a la atención de la Procuradora General el Informe de Investigación que preparó la Oficina de Administración de los Tribunales por los hechos posteriores que están íntimamente relacionados con el procedimiento disciplinario de epígrafe para que ausculte si procede presentar

una querella ética. Esta encomienda deberá realizarse con prontitud y mientras el licenciado García Vega cumple los dos años de suspensión.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal Supremo.


                        Aida Ileana Oquendo Graulau
                        Secretaria del Tribunal Supremo